## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **BENJAMIN RAMEY** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civ. Action No. 04-2088 (RJL)** |
| | ) | |
| **POTOMAC ELECTRIC POWER** | ) | |
| **COMPANY, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**st**

## MEMORANDUM OPINION
(March **31**, 2006) [#48]

Plaintiff, Benjamin Ramey, brought this action against defendants, Potomac Electric

Power Company ("PEPCO"), David Duarte, and Gregory Johnson (collectively,

"defendants"), alleging discrimination, harassment, and retaliation in violation of 42 U.S.C.

§ 1981 ("Section 1981") and the District of Columbia Human Rights Act ("DCHRA"), D.C.

Code § 2-1401.01 *et seq.*, and common law claims of negligent hiring, training and

supervision, failure to create or implement policies, and negligent and intentional infliction

of emotional distress.  Currently before the Court is defendants' Motion to Dismiss for lack

of subject matter jurisdiction and failure to state a claim upon which relief can be granted.

For the reasons set forth below, defendants' Motion is GRANTED.

## BACKGROUND

Plaintiff is a dark-skinned African American who allegedly suffers from a condition

that causes the whites of his eyes to be a reddish brown.  (Am. Compl. ¶ 8.)  At the time of

the events upon which plaintiff's claims are based, plaintiff was employed by defendant

PEPCO as a conduit installer. (Flack Decl. at Ex. A, 4.)  As part of his duties, plaintiff was

required to operate commercial vehicles in excess of 26,000 pounds.  (Flack Decl. at Ex. B,

2.)

On August 31, 2003,[1] at approximately 11:45 p.m., defendant Gregory Johnson, a

PEPCO supervisor, accused plaintiff, shortly after he arrived for work, of being intoxicated.

(Am. Compl. ¶ 9.)  Indeed, defendant Johnson testified that he did so because the plaintiff

"smelled of alcohol, his speech was slurred and incoherent, he was unsteady on his feet and

his eyes were very bloodshot."  (Flack, Decl. at Ex. A, 6.)  Defendant Duarte, another

PEPCO supervisor, directed Mr. Johnson to perform a breathalyzer test. (Am. Compl. ¶ 11.)

Because a test could not be performed on-site, plaintiff was taken to 9th and G Streets[2] to

have the test performed there. (*Id.*)  Alas, the test could not be performed at 9th & G Streets

either, and plaintiff was taken to a hospital in Virginia by Mr. Negussie Birratu, a PEPCO

human resources partner, Mr. Loman Dudley, a union steward, and Mr. Johnson. (*Id.* ¶¶ 11,

13.)  According to plaintiff, the four men waited for about an hour and a half before they

learned that the breathalyzer could not be performed at the hospital.  (*Id.* ¶ 15.)  Plaintiff

claims that he was then taken to another facility where he waited another four hours.  (*Id.* ¶

---

[1]    There is disagreement as to whether the allegations in plaintiff's Amended Complaint are
based on events that occurred on August 30 and 31, 2003 or August 31 and September 1, 2003.
Because the parties essentially agree that a *version* of the events alleged by plaintiff did in fact occur,
the Court does not find the dispute over the date to be a material one. The Court will use "the night
of August 31, 2003" for ease of reference.

[2]    Presumably a building or facility is located at 9th and G Streets, though it is unclear from
plaintiff's pleadings. A review of the arbitration proceedings between PEPCO and plaintiff's union
indicates that 9th and G Streets may have been the location of Edison Place, PEPCO headquarters.

16.)  Again, the breathalzyer could not be performed there, and plaintiff was returned to 9th & G Streets where the test was finally administered eleven to twelve hours after plaintiff was first confronted by his supervisor. (*Id.* ¶¶ 19-20.) At that time, plaintiff's blood alcohol level registered at 0.065% to 0.07%, a level at which an individual is considered unfit for duty under PEPCO guidelines. (Flack Decl. at Ex. A, 3,6.) In response, PEPCO placed plaintiff on Decision Making Leave ("DML"), the disciplinary step one level below termination. (*Id.* at Ex. A, 6.)

In addition, plaintiff alleges that he was denied water and the use of a restroom throughout the night. (Am. Compl. ¶¶ 12, 15, 16.)  Plaintiff further claims that when he asked to use the restroom, he was told, "you [pause] shut up" (*id.* ¶ 12) and "you [pause] no" (*id.* ¶ 15).  According to his Amended Complaint, plaintiff claims to have "understood" that he was being told "you "Niger" [sic] shut up" (*id.* ¶ 12) and "you "Niger" [sic] no" (*id.* ¶ 15) by the inflection and tone of the speaker's voice and by the way the speaker paused (*id.* ¶¶ 12, 15).  At no point, however, does plaintiff allege, let alone testify, that the word "nigger" was ever even uttered on the night of August 31, 2003 – or on any other night for that matter.

After the incident on August 31, 2003, the International Brotherhood of Electrical Workers Local 1900 ("Local 1900") filed a grievance against PEPCO on plaintiff's behalf.[3] (*Id.* ¶ 21.)  After the grievance was filed, plaintiff alleges that he was informed by Mr.

---

[3]      The terms and conditions of plaintiff's employment were governed by a collective bargaining agreement between Local 1900 and PEPCO. (Defs.' Mot. to Dismiss at 4 (citing Appuglies Decl. at Ex. A).)

Johnson that his request for leave, which plaintiff claims was approved prior to the incident, had not in fact been approved. (*Id.* ¶ 22.) Plaintiff further alleges that at a meeting with the Department of Human Resources on February 25, 2004, he was informed by Ms. Jill Flack, an attorney for PEPCO, that if he dropped the grievance and the lawsuit he could return to work. (*Id.* ¶ 25.) Then again on November 4, 2004, Ms. Flack told Mr. Joe Hawkins to inform plaintiff that if he dropped the grievance and the lawsuit he could return to work. (*Id.* ¶ 26.) Plaintiff refused to drop the grievance or the lawsuit. (*Id.* ¶ 27.) On November 9, 2004, plaintiff was terminated by PEPCO. (*Id.* ¶ 27.) According to PEPCO, plaintiff was terminated for failing to successfully complete a drug and alcohol rehabilitation program that he was required to undergo after he was found to be intoxicated at work in August 2003. (Flack Decl. at Ex. B, 7-8.)

## DISCUSSION

I.    *Standard of Review*

Defendants move to dismiss plaintiff's Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted. "If, [however,] on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(c). Because both parties have presented materials outside the pleadings – which the Court must rely upon in evaluating plaintiff's claims under 42

U.S.C. § 1981 – the Court will decide the Motion in accordance with Rule 56, rather than as a motion to dismiss. *See Brug v. Nat'l Coalition for the Homeless*, 45 F. Supp. 2d 33, 36 n. 3 (D.D.C. 1999) (finding that where both parties have presented materials outside the pleadings it will be fair to treat defendant's motion as one for summary judgment).

Pursuant to Rule 56, summary judgment shall be granted when the record demonstrates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes over non-material facts may be resolved in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Where facts material to the outcome of the case are at issue, however, the motion may not be disposed of by summary judgment. *Id.* at 248. If the facts in dispute are "merely colorable, or . . . not significantly probative, summary judgment may be granted." *Id.* at 249-50. A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 248; *see also Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 150 (D.C. Cir. 1996). "[T]he determination of whether a given factual dispute requires submission to a jury must be guided by the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 255. If there is insufficient evidence indicating that a jury could return a favorable verdict for the nonmoving party, then summary judgment is proper. *See Nat'l Geographic Soc'y v. Int'l Media Ass'n,*

5

*Inc.*, 732 F. Supp. 4, 4 (D.D.C. 1990).

II.    *Plaintiff's Common Law Claims*

Plaintiff's common law claims are preempted by the District of Columbia Worker's

Compensation Act, D.C. Code §§ 32-1501 *et seq.*, which provides the exclusive remedy for

plaintiff's alleged injuries.  D.C. Code § 32-1504(a).  Section 32-1504(a) states that any

liability of the employer under the act "shall be exclusive and in place of all liability of such

employer to the employee." *Id.*; *see also District of Columbia v. Thompson*, 593 A.2d 621,

634 (D.C. 1991) (holding that the D.C. Council intended "to create a mechanism for

addressing virtually every conceivable personnel issue among the District, its employees, and

their unions – with a reviewing role for the courts as a last resort, not a supplementary role

for the courts as an alternative forum").  Courts have consistently found that the common law

claims brought by the plaintiff are the type of claims for which the Workers Compensation

Act is designed to be the exclusive remedy. *See Tatum v. Hyatt Corp.*, 918 F. Supp 5, 8

(D.D.C. 1994) (holding that claims of assault and battery, intentional infliction of emotional

distress, negligent infliction of emotional distress, and negligent hiring and supervision are

preempted by the D.C. Workers Compensation Act).  Because the D.C. Workers

Compensation Act is the exclusive remedy for the common law claims brought by the

plaintiff, these claims are dismissed.[4]

---

[4]     Defendants also argue that plaintiff's common law claims are preempted by Section 301 of
the Labor Management Relations Act ("LMRA"). *See* 29 U.S.C. § 185. Although the Court tends
to agree with defendants in this regard, because it has held that those claims are preempted under the
D.C. Workers Compensation Act, the Court need not separately address defendants' Section 301
preemption argument.

III.    *Plaintiff's Discrimination Claim*

Plaintiff further asserts that he was discriminated against in violation of 42 U.S.C. §
1981, which guarantees freedom from racial discrimination in the "making, performance,
modification, and termination of contracts, and the enjoyment of all benefits, privileges,
terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).  Our Circuit has
adopted the *McDonnell Douglas* burden shifting framework to analyze a § 1981 claim.  *See*
*Murray v. Gilmore*, 406 F.3d 708, 713 (D.C. Cir. 2005).  Under this scheme, the plaintiff
bears the initial burden of establishing a prima facie case of discrimination.  *McDonnell*
*Douglas*, 411 U.S. at 802.  Once the plaintiff makes such a showing, the burden shifts to the
defendant employer to specify "some legitimate, nondiscriminatory reason" for the adverse
employment action.  *Id.*  "Assuming . . . that the employer has met its burden of producing
a nondiscriminatory reason for its actions, the focus of proceedings at . . . summary judgment
. . . will be on whether the jury could infer discrimination from the combination of (1) the
plaintiff's prima facie case; (2) any evidence the plaintiff presents to attack the employer's
proffered explanation for its actions; and (3) any further evidence of discrimination that may
be available to the plaintiff (such as independent evidence of discriminatory statements or
attitudes on the part of the employer) or any contrary evidence that may be available to the
employer (such as evidence of a strong track record in equal opportunity employment)." *Aka*
*v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998).

To establish a prima facie case of discrimination, the plaintiff must establish that he

is (1) a member of a protected class, (2) he was subjected to an adverse employment action, and (3) the unfavorable action gives rise to an inference of discrimination. *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002). The only actionable conduct that plaintiff alleges is the termination of his employment on November 9, 2004.[5]  (Am. Compl. ¶ 27.)  For the following reasons, the Court finds that plaintiff's termination does not give rise to an inference of discrimination.

"To make out a claim under Section 1981[,] a plaintiff must demonstrate that he was (1) treated differently than others who were similarly situated (2) because of his race." *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1413 n.7 (D.C. Cir. 1988). Plaintiff is not only unable to demonstrate that he was terminated because of his race, he does not even allege facts that would support this being the case.[6]  Nowhere in his

---

[5]     Plaintiffs remaining allegations do not constitute actionable "adverse employment actions." Our Circuit has clearly held that "[t]o establish an adverse personnel action in the absence of diminution of pay or benefits, plaintiff must show an action with 'materially adverse consequences affecting the terms, conditions, or privileges of employment.'" *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)). Further, an "employment decision does not rise to the level of an actionable adverse action . . . unless there is a tangible change in the duties or working conditions constituting a material employment disadvantage." *Id.* (citation omitted; alteration in original); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998) ("A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."). Thus, plaintiff's allegations regarding the August/September 2003 breathalyzer testing and the denial of his leave request fall short of the conduct necessary to establish an actionable Section 1981 adverse employment action.

[6]     Plaintiff's Amended Complaint can be read to allege that plaintiff was treated differently because of his race in relation to the events leading up to the administration of the August 2003 breathalyzer test. As discussed above, however, this is not an actionable adverse employment action under Section 1981. Even if it were, plaintiff's allegations are insufficient to establish an inference of discrimination. Plaintiff alleges that Mr. Naguse Birratu, a low-level management employee, and Mr. Dudley, a line employee, either stated that plaintiff would have been treated differently if he

Amended Complaint does plaintiff allege that others who were similarly situated, *i.e.*, PEPCO employees who were found to be intoxicated at work and then terminated for not completing an approved rehabilitation program for drugs and alcohol (Flack Decl. at Ex. B, 7-8), were or would be treated any differently if they were of another race. Plaintiff is thus unable to establish that his termination gives rise to an inference of discrimination. As such, plaintiff cannot make out a prima facie case of race discrimination, and his claim must be dismissed.[7]

## IV.   *Plaintiff's Harassment Claim*

Plaintiff next brings a hostile work environment claim based on the events of August 31, 2003 and the administration of another breathalyzer test on an unspecified date post-August 31 (*see* Am. Compl. ¶ 24). For plaintiff to establish a prima facie case of hostile work environment, he must demonstrate that: (1) he belongs to a protected group; (2) he was

---

were white or did not deny the allegation when asserted by the plaintiff himself. (*See* Am. Compl. ¶¶ 16,18.) Neither man had the authority to discipline or fire plaintiff. (Defs.' Mot. to Dismiss at 16). As such, these statements are not probative of discriminatory intent. *See Garrett v. Jujan*, 799 F. Supp. 198, 200 (D.D.C. 1992) ("Stray remarks by persons not involved in the employment decision-making process are not material to a finding of discrimination . . . .").

[7]     Even if plaintiff were able to establish a prima facie case of discrimination under Section 1981, he fails to rebut defendants' showing of a legitimate, nondiscriminatory reason for terminating his employment. According to PEPCO, plaintiff was terminated from his job after failing to successfully complete a drug and alcohol rehabilitation program that he was required to undergo after he was found to be intoxicated at work in August 2003. (*Id.*) Plaintiff offers no response to the company's explanation except to essentially repeat the conclusory allegations already set forth in his Amended Complaint. This does not satisfy plaintiff's burden. What plaintiff appears to conveniently ignore in bringing this suit is the fact that defendants have produced evidence which demonstrates that, on the night of August 31, 2003, plaintiff showed up to work drunk – so drunk that when he was finally given a breathalyzer test, eleven to twelve hours after he was first confronted by his supervisor, his blood alcohol level still registered at 0.065% to 0.07%. (Flack Decl. at Ex. A, 6.) This is not a close call.

subjected to unwelcome harassment; (3) the harassment complained of was based on race;

(4) the harassment complained of affected a term, condition, or privilege of employment; and

(5) the employer knew or should have known of the harassment in question and failed to take

prompt remedial action.[8]  *Gustave-Schmidt*, 360 F. Supp. 2d at 120.  For the following

reasons, the facts of this case do not support a claim for hostile work environment.  First, as

touched upon above (*see infra* note 5), the conduct upon which plaintiff basis his claim did

not affect a term, condition, or privilege of employment, nor was it conduct that unreasonably

interfered with plaintiff's work performance.  The only conduct that adversely affected

plaintiff's work performance was his own.  Second, plaintiff cannot establish that the

harassment of which he complains was based in any way on his race – as opposed to the fact

that plaintiff was found intoxicated at work where he is responsible for, among other things,

operating commercial vehicles in excess of 26,000 pounds.  Indeed, plaintiff's somewhat

garbled allegation in his Amended Complaint to being called a "Niger" is totally undermined

by the fact that he never alleges that anyone from PEPCO actually uttered the word "nigger"

---

[8]        To determine the viability of a hostile work environment claim the Court will examine "all
the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is
physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably
interferes with an employee's work performance."  *Id.* (citation and internal quotation marks
omitted).  Hostile work environment claims are not meant to set a general code for the workplace;
rather a workplace environment becomes hostile "only when offensive conduct permeate[s] [the
workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or
pervasive to alter the conditions of the victim's employment."  *Stewart v. Evans*, 275 F.3d 1126,
1133 (D.C. Cir. 2002) (citation and internal quotation marks omitted; alterations in *Stewart*).  The
Court will determine if the offense rises to this level by considering the frequency of the harassing
conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably
interferes with an employee's work performance.  *Gustave-Schmidt v. Chao,* 360 F. Supp. 2d 105,
120 (D.D.C. 2004).  Only in rare and extreme circumstances will one incident be held to create a
hostile work environment.  *See Tatum v. Hyatt Corp.*, 918 F. Supp. 5, 7 (D.D.C. 1994).

on the night in question.   Thus, the only basis for his allegation is his subjective belief that defendants' pauses and silences amounted to some form of racial slur.   Such a conclusion is rank speculation.   Indeed, this Court is unable to find a single decision from our Circuit, our District, or any other federal court that holds such circumstances to constitute a hostile work environment.

Taking all of plaintiff's allegations as true, the isolated comments and incidents attributed to the defendants do not demonstrate as a matter of law that defendants' conduct was sufficiently severe or pervasive to sustain a hostile work environment claim.   The bulk of plaintiff's allegations center around the night of August 31 and early morning of September 1, 2003.   One incident – though reprehensible if true – does not a hostile work environment make.   *See Kidane v. Northwest Airlines, Inc.*, 41 F. Supp. 2d 12, 16 (D.D.C. 1999) ("Though remarks such as these, if true, doubtless are discriminatory and inappropriate, such isolated remarks are not sufficient to state a claim of hostile work environment under Title VII."); *Bundy v. Jackson*, 641 F.2d 934, 943 n.9 (D.C. Cir. 1981) (finding that "casual or isolated manifestations of a discriminatory environment, such as a few ethnic or racial slurs, may not raise a cause of action" under Title VII).[9]   For all of the above reasons, plaintiff's hostile work environment claim is dismissed.

V.   *Plaintiff's Retaliation Claim*

Plaintiff's next claim is one of retaliation.   Plaintiff alleges that after he filed his union

--------------------------------------------------

[9]      "[T]he same standards apply in evaluating claims of discrimination and retaliation under Title VII and § 1981." *Kidane*, 41 F. Supp. 2d at 17.

grievance, he was denied leave that had been previously authorized by his supervisor. (Am. Compl. ¶ 22.)  He also alleges that his employment was terminated when he refused to abandon his union grievance and this lawsuit.  (*Id.* ¶¶ 25-27.)  Like his other claims, plaintiff's retaliation claim must fail.

To make out a prima facie case of retaliation a plaintiff must "demonstrate:  (1) that []he engaged in a statutorily protected activity; (2) that the employer took an adverse personnel action; and (3) that a causal connection existed between the two."  *Stewart*, 275 F.3d at 1134.  This Court first asks whether plaintiff engaged in statutorily protected activity such that he may seek redress for defendants' alleged retaliatory actions.  While a formal EEOC complaint of discrimination has long been held to be a protected activity under Title VII, *see, e.g., Jones v. Billington*, 12 F. Supp. 2d 1, 13 (D.D.C. 1997), our Circuit has not directly addressed the question of whether the filing of a union grievance is also protected. A member of this Court, however, has held that a grievance filed by the plaintiff is not protected activity where the plaintiff "fails to allege any discrimination based on race, color, religion, sex, or national origin."[10] *Billington*, 12 F. Supp. 2d at 13.

---

[10]     This analysis is consistent with the holdings of our sister circuits. *See e.g., Moore v. United Parcel Serv.*, 150 Fed. Appx. 315, 319 (5th Cir. 2005) (holding that the plaintiff "was not engaged in protected activity, as his grievance did not oppose or protest racial discrimination or any other unlawful employment practice under Title VII"); *Tiedeman v. Neb. Dep't of Corr.*, 144 Fed. Appx. 565, 566 (8th Cir. 2005) (holding that the plaintiff's grievance was not protected because it was not based on discrimination or another practice made unlawful under Title VII.).  Other districts have applied this analysis to issues directly involving union grievances. *See, e.g., Lewis v. Conn. Dep't of Corr.*, 355 F. Supp. 2d. 607, 617 (D. Conn. 2005) ("[T]he union grievance [plaintiff] filed . . . did not explicitly allege racial discrimination and thus could not be considered protected activity under Title VII."); *Clemente v. N. Y. State Div. of Parole*, No. 01 Civ. 3945(TPG), 2004 WL 1900330, at *13 (S.D.N.Y. Aug. 24, 2004) (holding that union grievances that do not allege discrimination are

Following this precedent, the union grievance filed by the plaintiff is not categorically protected, but may be considered protected activity if it alleges discrimination or another practice made unlawful under Title VII. After a careful review of the arbitration proceedings between PEPCO and plaintiff's union (*see* Flack Decl. at Exs. A-B), the Court finds that plaintiff's union grievance did not allege discrimination, but instead strictly challenged the authority of PEPCO to subject plaintiff to a breathalyzer test on the night/morning in question. Thus, plaintiff's union grievance is not protected activity and, as such, cannot be used as the basis for a claim of unlawful retaliation.[11] Plaintiff's retaliation claim is therefore dismissed.

## VI.   *Plaintiff's DCHRA Claims*

Finally, with respect to plaintiff's claims under the DCHRA, in light of the fact that

not protected activity under Title VII); *Vital v. Interfaith Med. Ctr.*, No. 96CV363FBSMG, 2001 WL 901140, at *6 (E.D.N.Y. July 31, 2001) (holding that a union grievance that does not concern discrimination is not protected activity).

[11]   Plaintiff is therefore left only with his allegations regarding PEPCO attorney Ms. Jill Flack's offer to allow him to return to work upon abandoning this lawsuit. The only evidence that plaintiff alleges to support his claim of retaliation in this respect is either temporally incoherent or easily rebutted by defendants. Plaintiff alleges that on February 25, 2004, defendant told plaintiff that if he dropped the lawsuit, he could return to work – but there was no lawsuit at the time. (Am. Compl. ¶ 25.) Plaintiff alleges he was told the same thing on November 4, 2004 (Am. Compl. ¶ 26), but at that time, defendant still had not been notified of the lawsuit (Defs.' Mot. to Dismiss 21). In any event, assuming plaintiff's facts are somehow true, offers of compromise or settlement are not probative of discriminatory or retaliatory intent. *See Carney v. American Univ.*, 960 F. Supp. 436, 449 (D.D.C. 1997). Moreover, as discussed *supra* note 7, plaintiff is unable to rebut PEPCO's showing of a legitimate, nondiscriminatory reason for terminating his employment. According to PEPCO, plaintiff was terminated from his job after failing to successfully complete a drug and alcohol rehabilitation program that he was required to undergo after he was found to be intoxicated at work in August 2003. (Flack Decl. at Ex. B, 7-8.) Nothing in the record before this Court suggests that there is any causal connection between PEPCO's decision to terminate plaintiff and the filing of this lawsuit. Conversely, the record is replete with evidence that PEPCO's decision to terminate plaintiff was eminently reasonable and devoid of discriminatory or retaliatory animus.

DCHRA and federal discrimination claims are analyzed under the same legal standard, *see Price v. Washington Hosp. Ctr.*, 321 F. Supp. 2d 38, 47 (D.D.C. 2004), plaintiff's claims under the DCHRA similarly must fail. *See supra* Sections III-V. Accordingly, these claims are also dismissed.

## CONCLUSION

For the foregoing reasons, defendants' Motion to Dismiss, which the Court has converted to a motion for summary judgment, is GRANTED. An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge